IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br><br><br>vs.<br><br><br>JESUS DANIEL URIAS ARMENTA, aka, GERARDO GARCIA, aka, JESUS RICARDO CARDENAS-ARMENTA,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER DENYING MOTION TO SUPPRESS**<br><br><br><br><br><br>Case No. 1:08-CR-139<br><br><br><br>Judge Dee Benson |

Before the court is the defendant's motion to suppress evidence discovered during a search of the defendant's residence on October 19, 2008. (Dkt. No. 22.) On January 3, 2012 and January 12, 2012, the court conducted evidentiary hearings on the motion. The defendant was present with his counsel, Scott C. Williams. The government was represented by Special Assistant United States Attorney Don Brown. At the conclusion of the evidentiary hearings, the court ordered a transcript and briefing from the parties. Thereafter, at the government's request, the court set oral argument to be heard on March 13, 2012. On March 7, 2012, the government

1

moved to continue oral argument so that it could submit a recording of an Arizona traffic stop

involving the defendant. (Dkt. No. 35.) The defendant objected to the continuance. (Dkt. No.

36.) On March 13, 2012, the court heard oral argument on the government's motion to continue.

The court denied the motion to continue. The court then heard oral argument on the suppression

briefing. The defendant argued that the government had not met its burden of proving that the

defendant voluntarily consented to the entry and search of his house. The government rested on

its briefs. The court took the matter under advisement. Having considered the parties' briefs, the

evidence presented at both hearings, and the arguments of counsel, the court enters the following

Memorandum Decision and Order.

## EVIDENTIARY HEARING

On January 3, 2012, the government called Officer Brian Val Kirby of the Sunset City

Police Department as its witness. After Officer Kirby testified, the defendant testified on his own

behalf. The court then continued the hearing until January 12, 2012, so that Deputy David Parker

Passmore could testify.[1]

## I. Testimony of Officer Brian Val Kirby

Officer Kirby and other officers responded to a complaint of loud music on October 19,

2008, in Sunset City, Utah. (Tr. at 6-7.) The officers wore their uniforms which included badges

and weapons. (Tr. at 16.) The loud music came from a car located in the backyard area of a

house. (Tr. at 15-18.) This backyard area included the side of the house and was separated from

the street by a tall fence. (Tr. at 15-18.) The officers approached a gate and peered into the

---

[1]Reference to the transcript of the evidentiary hearings conducted on January 3, 2012 and
January 12, 2012, will be cited as "Tr. at __."

backyard area near the car. (Tr. at 17.) The officers observed three women and one man, the defendant, near the vehicle from which the music was being played. (Tr. at 17.) Deputy Boucher advised that he saw one of the women possessing drug paraphernalia. (Tr. at 20.)

The police officers entered the backyard area through the gate and approached the individuals. (Tr. at 20.) Deputy Boucher approached two of the women and investigated the drug paraphernalia while Officer Kirby approached the third woman and the defendant. (Tr. at 20.) Officer Kirby communicated with the third woman and the defendant in English. (Tr. at 55.) Officer Kirby introduced himself, explained why he was there, and asked who lived at the residence. (Tr. at 20.) Officer Kirby was informed that the third woman and the defendant lived at the residence. (Tr. at 20.) The third woman spoke English. (Tr. at 63.) The third woman did not speak Spanish. (Tr. at 63.) Officer Kirby observed the third woman and the defendant communicate with each other. (Tr. at 63.)

Deputy Boucher advised Officer Kirby that one of the women he approached possessed a drug pipe. (Tr. at 7-8.) The women Deputy Boucher approached also possessed a box containing additional drug paraphernalia and marijuana. (Tr. at 9, 23.) The two women admitted that they had smoked marijuana. (Tr. at 23.)

Officer Kirby asked the third woman and the defendant for identification. (Tr. at 8.) The third woman and the defendant provided identification. (Tr. at 8.) Officer Kirby used the identification to check for outstanding warrants. (Tr. at 8.)

Officer Kirby conducted <u>Terry</u> frisks of the third woman and the defendant. (Tr. at 8.) While conducting the <u>Terry</u> frisk of the defendant, Officer Kirby communicated to the defendant in English. (Tr. at 55.) Officer Kirby asked the defendant to stand. (Tr. at 27.) The defendant

3

stood. (Tr. at 27.) Officer Kirby asked the defendant to turn around and put his hands around his back so that he could be searched. (Tr. at 27.) The defendant turned around and put his hands around his back. (Tr. at 27.)

Officer Kirby inquired generally as to whether anyone else was inside the house. (Tr. at 27.) The third woman stated that her child was asleep inside the house. (Tr. at 27.) Sometime after that, the third woman became belligerent and announced that all of the drugs and drug paraphernalia were hers. (Tr. at 9.) The third woman was placed in hand restraints along with the two other women. (Tr. at 9.) Officer Kirby escorted the three women off of the premises and placed them in police vehicles. (Tr. at 9.)

Upon returning to the backyard area, Deputy Passmore advised Officer Kirby that he had received consent from the defendant to enter the house to check on the baby and that he had done so. (Tr. at 9.) Deputy Passmore also advised that he had smelled an odor of burnt marijuana coming from one of the rooms in the house. (Tr. at 8-11.)

Officer Kirby then approached the defendant. (Tr. at 13.) He asked the defendant if there was anything illegal in the house. (Tr. at 28.) The defendant answered, "No." (Tr. at 28.) Officer Kirby asked the defendant if he could enter and search the home. (Tr. at 13, 28.) The defendant responded, "Okay, yes." (Tr. at 13, 28.) Officer Kirby also asked the defendant if he would like to go inside as well. (Tr. at 14, 29.) The defendant said, "Yes." (Tr. at 14, 29.)

Officer Kirby, Deputy Boucher, Deputy Passmore, and the defendant entered the house. (Tr. at 14, 29.) The defendant was quiet and passive. (Tr. at 29.) Officer Kirby smelled the odor of burnt marijuana in the house. (Tr. at 46.) The officers searched the room in which Deputy Passmore had smelled burnt marijuana and found two packages of methamphetamine in a

4

drawer. (Tr. at 46.) The defendant, who had remained in the kitchen area, was then taken into custody and placed in a police car. (Tr. at 29.)

## II. **Testimony of Defendant Jesus Armenta, aka, Gerardo Garcia**

On the night in question, the defendant, his wife and two other woman were in the backyard area of his house when the police entered the area through a gate in the fence. (Tr. at 33-34.) The police immediately confronted them and directed that the music coming from the car be turned down. (Tr. at 34.) The defendant turned the music down. (Tr. at 34.)

The defendant observed the police talking to the women in English. (Tr. at 35.) The defendant saw the police identify the pipe in one of the women's hands and understood that the police were asking "questions about whose that was . . . ." (Tr. at 37.) The defendant was asked for his identification, which he gave and never got back. (Tr. at 36.) The defendant was also patted down. (Tr. at 37.) The defendant saw his wife get into a disagreement and become animated with the police. (Tr. at 37.) The defendant further witnessed the police physically place their hands on the women and remove them from the backyard. (Tr. at 38.)

The defendant was then approached by Deputy Passmore about checking on a child inside the house. (Tr. at 38.) The defendant responded by asking Deputy Passmore if he had a paper to go into his house. (Tr. at 39.) Deputy Passmore said he did not have a paper and went into the house. (Tr. at 39.) The defendant tried to "say things" but ultimately stayed outside with another officer while Deputy Passmore went inside the house. (Tr. at 39-40.)

After Deputy Passmore came back outside, the defendant was approached again by one of the officers about entering and searching the house. (Tr. at 40.) The defendant understood that he was being asked for permission to go into the house. (Tr. at 40.) The defendant refused and

5

asked again for a paper. (Tr. at 41.) The defendant's request for a paper was disregarded and the officer, along with others, entered the house. (Tr. at 41.) The defendant approached the officers and attempted to tell them to get out of the house. (Tr. at 41.) One of the officers grabbed the defendant by the arm, twisted it behind his back, and took the defendant into custody. (Tr. at 41.)

Although unclear at first, the defendant ultimately testified that Deputy Passmore was the officer who approached him about entering and searching the house. (Tr. at 40, 42.) The defendant denies that he communicated with Officer Kirby regarding consent to enter and search the residence. (Tr. at 42.)

The defendant admitted that he is a convicted felon. (Tr. at 43.) The defendant's conviction was for methamphetamine possession. (Tr. at 43.)

### III.  Testimony of Deputy David Parker Passmore

Deputy Passmore was not able to review his report of the incident before testifying at the evidentiary hearing. (Tr. at 67.)

Deputy Passmore was called to a noise incident in Sunset City on October 19, 2008. (Tr. at 66.) Deputy Passmore and other officers arrived at the residence in question. (Tr. at 66.) While at the gate in the fence, one of the other officers stated that he saw someone smoking marijuana. (Tr. at 66, 69.) The officers entered through the gate together. (Tr. at 68.) Deputy Passmore did not investigate the marijuana possession or use. (Tr. at 69.) Deputy Passmore's role was to provide safety to the other officers. (Tr. at 70.) There were several women and one man in the backyard area near the car. (Tr. at 69.)

Concern arose regarding a child inside the house. (Tr. at 72.) One of the women repeatedly asked if she could go in and check on her baby. (Tr. at 72.) Deputy Passmore learned

6

that this woman was the mother of the child and the wife of the defendant. (Tr. at 74-75.) Deputy Passmore asked the woman if he could go into the house and check on the baby. (Tr. at 66, 72-73.) The woman said that was fine. (Tr. at 66, 72-73.)

Deputy Passmore entered the home to look for the baby. (Tr. at 66, 72-73.) While looking for the baby, Deputy Passmore entered a bedroom and noted the odor of marijuana. (Tr. at 67.) He located the baby in the closest bedroom to the front of the house. (Tr. at 66.) After checking on the baby, Deputy Passmore exited the house and told the other officers that he had smelled marijuana in the house. (Tr. at 74, 75).

Deputy Passmore and Officer Kirby went back into the house "pretty much immediate[ly]" after Deputy Passmore told the Sunset officers of the marijuana odor in the house. (Tr. at 76.) Deputy Passmore relied on the odor of marijuana in the house to justify re-entering and searching the house. (Tr. at 76.) Deputy Passmore does not recall communicating with anybody else before going back inside the house. (Tr. at 76.) Deputy Passmore denies having a discussion with the defendant about searching the defendant's house before he went back into the house to search it. (Tr. at 67.) Deputy Passmore does not recall hearing any other conversations among other persons regarding the search of the defendant's house before he went back into the house. (Tr. at 67.)

Deputy Passmore and Officer Kirby entered and searched the house. (Tr. at 78.) They found a small bag of methamphetamine and some cash in a chest of drawers. (Tr. at 78-79.) They exited the room where the contraband was found and saw the defendant in the kitchen area by the door. (Tr. at 79.) The defendant was taken into custody in the kitchen. (Tr. at 79.)

7

## FINDINGS OF FACT

The court makes the following findings of fact:

1. Officer Kirby, Deputy Boucher, and Deputy Passmore responded to a complaint of loud music at the defendant's residence in Sunset City, Utah, on October 19, 2008. (Tr. at 6-7, 20, 66.)

2. The loud music came from a car located in the backyard area of the defendant's house which was separated from the street by a tall fence. (Tr. at 15-18.)

3. The defendant, his wife and two other women were outside in the backyard area near the car. (Tr. at 17, 33-34.)

4. The officers approached a gate in the fence and Deputy Boucher advised the other officers that he saw one of the women possessing drug paraphernalia. (Tr. at 20.)

5. The officers wore their uniforms which included badges and weapons. (Tr. at 34.)

6. The officers entered the backyard area through the gate in the fence and approached the individuals. (Tr. at 20, 34.)

7. The officers directed that the loud music coming from the car be turned down. (Tr. at 34.)

8. The defendant turned down the music. (Tr. at 34.)

9. Deputy Boucher questioned two of the women in English about the drug paraphernalia. (Tr. at 20.)

10. The defendant watched as the two women were questioned and understood that the police were asking questions about who owned the drug paraphernalia. (Tr. at 37.)

11. The two women admitted that they had smoked marijuana. (Tr. at 23.)

12. The officers discovered that the two women possessed marijuana and additional drug paraphernalia. (Tr. at 9, 23.)

13. Officer Kirby asked the defendant and the defendant's wife for identification. (Tr. at 8, 36.)

14. The defendant and his wife provided identification. (Tr. at 8, 36.)

15. Officer Kirby used the identification to check for outstanding warrants. (Tr. at 8, 36.)

16. Officer Kirby did not return the identification to the defendant or his wife. (Tr. at 8, 36.)

17. Officer Kirby <u>Terry</u> frisked the defendant and the defendant's wife. (Tr. at 8.)

18. Officer Kirby communicated with the defendant and the defendant's wife in English. (Tr. at 55.)

19. Officer Kirby asked the defendant to stand. (Tr. at 27.)

20. The defendant stood. (Tr. at 27.)

21. Officer Kirby asked the defendant to turn around and put his hands around his back so that he could be searched. (Tr. at 27.)

22. The defendant turned around and put his hands around his back. (Tr. at 20.)

23. Concern arose regarding a child inside the house and Deputy Passmore asked the defendant's wife if he could go inside the house and check on the child. (Tr. at 66, 72-73.)

24. The defendant's wife gave permission for Deputy Passmore to go inside and check on the child. (Tr. at 66, 72-73.)

25. While inside the house to check on the baby, Deputy Passmore smelled the odor of marijuana. (Tr. at 67.)

9

26. At some point after the <u>Terry</u> frisks, the defendant's wife became belligerent and announced that the marijuana and the drug paraphernalia were all hers. (Tr. at 9, 37.)

27. The defendant's wife and the two other women were taken into custody and Officer Kirby placed them in police vehicles. (Tr. at 9, 38.)

28. Officer Kirby returned to the backyard area. (Tr. at 25.)

29. Deputy Passmore told Officer Kirby that he had gone into the house to check on a child and that he had smelled an odor of marijuana in one of the bedrooms. (Tr. at 25-26.)

30. Officer Kirby asked the defendant if there was anything illegal in the house. (Tr. at 28.)

31. The defendant answered, "No." (Tr. at 28.)

32. Officer Kirby then asked the defendant if he could enter and search the home. (Tr. at 13.)

33. The defendant understood that he was being asked for permission to enter the house. (Tr. at 40.)

34. The defendant consented to the search of his home by saying, "Okay, yes." (Tr. at 13.)

35. The defendant understood the English language as spoken by Officer Kirby. (Tr. at 13, 40.)

36. The defendant's consent to search was given freely, voluntarily, and unequivocally. (Tr. at 13.)

37. The defendant's consent was not coerced by the police officers. (Tr. at 13.)

38. Officer Kirby asked the defendant if he would like to go inside the house with the

10

officers and the defendant answered, "Yes." (Tr. at 13.)

      39. The officers and the defendant entered the house. (Tr. at 14, 46.)

      40. The defendant was quiet. (Tr. at 30.)

      41. Officer Kirby smelled the odor of marijuana in the house and the officers found methamphetamine in a drawer. (Tr. at 46.)

      42. The defendant was taken into custody. (Tr. at 29, 79.)

      43. The defendant is a convicted felon. (Tr. at 42.)

      44. The defendant was convicted of possession of methamphetamine. (Tr. at 43.)

## DISCUSSION AND CONCLUSIONS OF LAW

The Fourth Amendment to the United States Constitution protects citizens from unreasonable searches and seizures by government actors. See U.S. Const. Amend. IV; United States v. Sanchez, 89 F.3d 715, 717 (10th Cir. 1996). "[A] search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (quoting Katz v. United States, 389 U.S. 347, 357 (1967); Coolidge v. New Hampshire, 403 U.S. 443, 454-455 (1971); Chambers v. Maroney, 399 U.S. 42, 51 (1970)). Consent is a well established and well-delineated exception to the warrant requirement. Id. Valid consent is that which is "freely and voluntarily given." Id. at 222 (quoting Bumper v. North Carolina, 391 U.S. 543 (1968)). Whether an individual freely and voluntarily consented is a question of fact determined from the totality of the circumstances. United States v. Pena, 143 F.3d 1363, 1366 (10th Cir. 1998), cert. denied, 525 U.S. 903 (1998).

The government bears the burden of proving voluntary consent. Pena 143 F.3d at 1366.

First, "[the government] must present 'clear and positive testimony that consent was unequivocal and specific and freely and intelligently given.'" Id. (quoting <u>United States v. Angulo-Fernandez</u>, 53 F.3d 1177, 1180 (10th Cir. 1005)). Second, the government must show that the police did not coerce the defendant into granting his consent. See id.

A person being detained may still give voluntary consent. See <u>U.S. v. McRae</u> 81 F.3d 1528, 1537 (10th Cir. 1996). However, "if the detention is illegal, the government must prove that the primary taint has been purged and that the consent was in fact voluntary. The government's burden is therefore heavier if the detention is illegal." Id. (citations omitted; internal quotation marks omitted).

## I. **Clear and Positive Testimony**

The defendant asserts that "[t]he evidence in the present case represents a far cry from clear and positive testimony that consent was unequivocal and specific and freely given." (Defendant's Memorandum in Support of Motion to Suppress, Dkt. No. 29 ("Memo in Support") 7.) The defendant argues that the government's evidence fails because (1) the record is "hopelessly inconsistent and unclear" with regard to defendant's consent to search the house; and (2) "[t]he circumstances of the event . . . undermine any finding that specific consent was freely, clearly and unequivocally given." (Memo in Support at 7-9) (internal quotation marks omitted.) As shown by the above Findings of Fact, the court disagrees.

### A. <u>The Record</u>

The defendant claims that the testimony of Officer Kirby regarding the defendant's consent to search the house is not credible because it is contradicted by Deputy Passmore's testimony "that [Passmore] and Kirby re-entered the residence *immediately* after Passmore had

exited and informed the officers of the odor he smelled." (Memo in Support at 8) (emphasis added.) The defendant's characterization of Deputy Passmore's testimony is not accurate. Deputy Passmore actually testified that he and Officer Kirby went into the house "pretty much immediate[ly]" after the communication about the marijuana odor. (Tr. at 76.) "Pretty much immediately" is different than "immediately" and does not contradict Officer Kirby's testimony that he asked the defendant three short questions before he entered the house.

The defendant also claims that Deputy Passmore testified that "no consent to re-enter was sought or obtained by him *or any other officer* . . . ." (Memo in Support at 8) (emphasis added.) This also is not accurate. While it is true that Deputy Passmore testified that *he* did not seek or obtain consent from the defendant, Deputy Passmore testified that *he did not recall* hearing any other officer seek or obtain consent to enter the house. (Tr. at 67, 76.) Deputy Passmore clearly explained, "not having my report in front of me, I couldn't say if there was or wasn't [a discussion with regard to entering the home] or who did or who didn't [have a discussion with regard to entering the home]." (Tr. at 67.) Accordingly, Deputy Passmore's testimony is not as it is represented by the defendant and it does not contradict Officer Kirby's testimony regarding the defendant's consent to search the house.

The defendant's claim that Deputy Passmore would have heard the consent had it been given also fails. This claim is based on the faulty assumption that Deputy Passmore would have remembered the consent had it been given. As discussed above, Deputy Passmore explained that without his report he could not remember whether there had been a discussion regarding entry into the defendant's home. (Tr. at 67.) He simply could not recall that matter at the evidentiary hearing. (Tr. at 67.) This is not surprising. Deputy Passmore was not able to review his report

13

before he testified and the events in question occurred more than three years before the evidentiary hearing. (Tr. at 67.) Furthermore, consent was unnecessary in Deputy Passmore's mind. Deputy Passmore testified that he relied upon the odor of marijuana in the house to justify the search of the home. (Tr. at 76.) Thus, the fact that Deputy Passmore could not recall whether consent was given by the defendant although he was in his presence does not obscure the court's record.

Consequently, the record is not "hopelessly inconsistent and unclear" regarding the consent given to search the house. In fact, as reflected by the court's Findings of Fact, the record demonstrated a request for consent, which the defendant understood and agreed to freely and voluntarily. Officer Kirby's testimony concerning the matter is contradicted only by the testimony given by the defendant, which the court does not find credible.

B. The Circumstances of the Event

The defendant also argues that "[t]he circumstances of the event . . . undermine any finding that specific consent was freely, clearly and unequivocally given" because (1) the "officers at the scene did not speak Spanish" while "the defendant spoke primarily Spanish"; (2) "none of the common and available means of evidencing knowing consent were attempted"; and (3) "[t]he defendant's testimony . . . does nothing to support the government's claim of consent." (Memo in Support at 8-9) (internal quotation marks omitted.) The court disagrees.

The alleged language barrier did not prevent communication between the officers and the defendant. The defendant understood the request the officers made in English to turn down the loud music coming from the car. (Tr. at 34.) The defendant understood the conversation the officers had in English with the two women regarding ownership of the drug paraphernalia. (Tr.

14

at 37.) The defendant understood the request Officer Kirby made in English to stand on his feet. (Tr. at 27.) The defendant understood the request Officer Kirby made in English to turn around and put his hands around his back. (Tr. at 27.) Most importantly, the defendant understood the request, which was made in English, to enter and search his house. (Tr. at 40.) There was simply no credible evidence suggesting that the defendant did not understand the English words that were spoken to him.

Furthermore, the defendant admitted he understood that the officer was asking for his consent to enter and search his house. (Tr. at 40.) Had the defendant not understood that he was being asked for his consent to enter the house, a language barrier would be relevant to explain why the defendant could not have possibly given valid consent to search his home. Here, however, the defendant admits that he understood what the officer wanted – consent to go into the house. (Tr. at 40.) Accordingly, the alleged language barrier is irrelevant and does not undermine a finding that consent was given.

The defendant's argument as to the lack of written or otherwise recorded consent is also flawed. Although written or otherwise recorded consent may be found in other cases, it is not always practical, nor is it required. Verbal consent is sufficient and the testimony of verbal consent in this proceeding is sufficient to establish that consent was given. The fact that written or otherwise recorded consent was not obtained does not undermine a finding that verbal consent was voluntarily and knowingly given.

The defendant's assertion that "the defendant's testimony . . . does nothing to support the government's claim of consent" is also inaccurate. As stated above, in certain respects, the defendant's testimony actually supports the government's consent claim. The government's

15

claim rests squarely on Officer Kirby's testimony. Not only does the defendant's testimony support the same general narrative of the events given by Officer Kirby, it also supports the specific assertions that one of the officers sought the defendant's consent to enter the house and that the defendant understood what the officer wanted. (Tr. at 40.) While the defendant's testimony attempts to cast doubt on whether consent was ultimately obtained and who obtained it, the defendant's testimony clearly supports the fact that the defendant was asked for his consent to search the house and that he understood what was being requested of him. Accordingly, the defendant's testimony supports the foundational pillars of the government's consent claim.

C. Clear and Positive Testimony of Unequivocal and Specific Consent Given Freely and Intelligently

The court finds that the testimony of Officer Kirby demonstrates that the defendant freely and intelligently gave unequivocal and specific consent. Officer Kirby unambiguously testified that when he asked the defendant if he could enter and search the defendant's home the defendant answered, "Okay, yes." (Tr. at 13.) Officer Kirby's testimony is contradicted only by the defendant's testimony that although he was asked for consent he refused to allow the officers to go into the house unless they had "a paper." (Tr. at 40-41.)

This contradictory testimony requires the court to make a credibility determination. After hearing the testimony presented at the evidentiary hearing and reviewing all of the evidence presented to the court, the court rejects the testimony of the defendant, a convicted felon, that he asked for "a paper." The court accepts Officer Kirby's testimony that the defendant consented to the entry and search of his house.

The court now turns its attention to whether the consent was coerced.

## II.    Duress or Coercion

The defendant states that "[e]ven if this Court were to entertain the possibility of consent by the defendant, the government has failed to prove that whatever consent was given was [free from] any implied or express duress or coercion by police." (Memo in Support at 8-9) (internal quotation marks omitted.)  The court disagrees.

In a coercion analysis, the court must first determine what burden the government must satisfy.  "The government's burden is . . . heavier if the detention is illegal." McRae, 81 F.3d at 1537 (citations omitted; internal quotation marks omitted).  Here, the court finds that the brief detention of the defendant and others in the backyard was legally based on the fact the officers found the defendant in the immediate proximity of persons who possessed illegal drugs and drug paraphernalia and who also admitted to using them. (Tr. at 20, 23.)  Thus, the brief detention was supported by reasonable and articulable suspicion that illegal activity was occurring.  The court also finds that Deputy Passmore's initial entry into the house to check on the baby was based on receiving permission freely given from the defendant's wife.  Accordingly, the government does not have to satisfy the heavier burden. Id. at 1537.

In determining whether a consent to search was coerced under the standard burden,

> [A] court should consider, inter alia, physical mistreatment, use of violence, threats, threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the defendant within the totality of the circumstances.  An officer's request for consent to search does not taint an otherwise consensual encounter as long as the police do not convey a message that compliance with their request is required.

Pena, 143 F.3d at 1367 (citations omitted; internal quotation marks omitted).  In this case, the defendant does not assert that the police resorted to any of these tactics.  Rather, the defendant

17

contends that police coerced him to consent because of the following:

> [T]here were many officers in uniform with guns and badges, the show of force
> and authority in arresting the women in the defendant's presence, the detention
> effected by the taking and keeping of the defendant's identification, the non-
> public scene, the failure to advise the defendant that he could leave and need not
> consent to search, the physical frisking of the defendant and his wife, etc...

(Memo in Support at 10.)

While some of these circumstances are relevant to the inquiry, under the totality of the

circumstances, they fail to demonstrate coercion. Although the officers' weapons were visible,

they were not used in a threatening manner. Pena, 143 F.3d at 1367. While it is true that the

officers showed their authority by detaining, frisking and arresting persons at the residence, the

detentions, frisks, and arrests were legal and appropriately conducted. McRae, 81 F.3d at 1533-

37. Lastly, although the officers did not advise the defendant that he could refuse to consent to

the search, there is nothing to suggest that the officers conveyed a message that compliance with

their request was required. Id. at 1536; Bustamonte, 412 U.S. at 226-227.

The facts cited by the defendant above provide little weight in favor of finding coercion.

The record testimony shows rather an absence of mistreatment, violence, threats, threats of

violence, promises, inducements, deception, trickery or other police behavior that could support a

finding of coercion. See Pena, 143 F.3d at 1367. In the totality of the circumstances, the

defendant's consent was voluntary, and the search was reasonable.

18

**CONCLUSION**

For reasons stated above, the defendant's Motion to Suppress is DENIED.


Dated this 12th day of April , 2012.

Dee Benson
United States District Court Judge